ANNA M. SLAUGHTER, Executrix, Appellee, v. COLUMBUS MUTUAL LIFE INSURANCE COMPANY, Appellant.

No. 40890.

452

January 12, 1932.

Rehearing Denied April 8, 1932.

Longley, Ransier & Frank, for appellant.

C. J. Rudolph and Tuthill, Reed & Beers, for appellee.

Albert, J.—The deceased, J. W. Slaughter, was the assured named in the policy issued by the defendant company to him which was in force at the time of the controversy herein. He was a farmer and teamster by occupation and was injured on or about the 14th day of October, 1929, and died on the 16th day of October. The appellant states:

"In this case there is but really one issue to be considered by the court upon appeal and that is whether under the facts as alleged and proven, the assured, J. W. Slaughter, suffered loss of life by being accidentally thrown from a wrecked or disabled private horsedrawn vehicle."

This being the sole question raised by the appellant, we will give attention to the fact situation to obtain the answer therefor.

Rainbow Drive, a paved highway running approximately east and west, is a connecting link between the cities of Waterloo and Cedar Falls. The paving is 18 feet in width, with shoulders on either side about four feet wide and approximately level with the pavement. There is a roadway or lane running at right angles to and in a southerly direction from Rainbow Drive into

what is known in the record as ''Gibson's Gardens.'' Approximately where this lane passed across the line between the highway and these gardens, on either side thereof, are two built-up pillars of granite or cement about 36 feet apart. This roadway is about 14 feet wide and ''graded up somewhat.'' The distance from the shoulder to the point where the lane enters the field is from 20 to 24 feet, and the drop from the level of the pavement to the point where the driveway enters the field between these pillars is about 4 feet.

Slaughter had a small farm, on which was located a gravel pit, on the north side of Rainbow Drive, and some distance west of where the lane turns off into Gibson Gardens. On the 14th day of October, 1929, the deceased loaded his wagon with gravel, which held about a yard of gravel, weighing from 2,700 to 2,900 pounds. He then passed onto the paved highway, traveled east until he reached the point where the lane turned off to the Gibson Gardens. As he turned into this lane from the pavement, the right front wheel dropped into a chuck hole about a foot deep, the wagon ran onto the horses, frightening them, and they started to run. From the jolt caused by the wagon's dropping into the chuck hole, Slaughter went forward from the wagon onto the doubletrees, where he rode for some little time, possibly three or four rods, when he fell off to the ground, and two of the wheels of the wagon passed over him. After the wagon passed over him, the team continued running for a distance of about 450 feet, where they came to a stop of their own accord.

An eyewitness to the accident was a mail carrier, sitting in his car about 25 or 30 feet from the point where Slaughter's wagon turned south to leave the highway, who described the accident in substance as above set out. He testified that Slaughter was sitting in the front end of the box, with his feet hanging over between the box and the horses, and he further says that he did not observe that the wagon, when it dropped into the chuck hole, was broken or in any way damaged, wrecked or disabled; that he did not observe that it was wrecked or disabled in any way at the time the wagon passed over Slaughter; that practically at the time the wheel dropped into the chuck hole Slaughter was precipitated or thrown onto the doubletrees, and as he fell forward, his pull on the lines was released and the horses started to run. He said:

"I could not state whether Mr. Slaughter was sitting on the board (the seat) or whether he was sitting directly on the gravel. He was not sitting down on the wagon, he was sitting on the top, and the end gate passed under him in some way. When Slaughter was on the doubletrees it was a side view I got of him. He was balanced on the doubletrees as much as though he was sitting with his feet toward the center and his body towards somewhere near the end of the doubletree on the left-hand side. I could see both his head and his feet. I mean to say that I had practically a clear view of Mr. Slaughter's body, but not possibly of his feet. I couldn't see that the wagon swayed any."

The box on the wagon which was used for hauling gravel was constructed of two by fours and two by sixes. On the inside of the sideboards, cleats were nailed which held the end gates in place. The seat used by the deceased consisted of a loose board, and the seat's being placed behind the standard on front of the wagon held it from sliding forward. The front end gate was about a foot from the front end of the box of the wagon.

So far these facts are undisputed.

At some time between the time the wagon left the pavement and the team stopped after the runaway, the right front cleat at the front end of the wagon which held the end gate was broken loose, which, of course, freed the end gate at that end and allowed the gravel to escape to the ground. One question raised is as to when this cleat was broken.

The evidence shows that at the point where Slaughter's body was found, there was blood on the ground at a point about 40 feet south of the pavement, and a "heap of gravel" a short distance north of the blood, and this gravel gradually spread down thinner to the place where the wagon and team were (stopped). Except as above stated, there was no gravel observed on the driveway leading from the pavement where the accident occurred, nor was there any gravel on the pavement. The seat board was found after the accident about halfway between the pillars and the place where the blood was found on the road. The road over which the horses pulled the wagon from where it left the pavement and the accident occurred to where the horses stopped seemed to be a reasonably smooth

track. An examination of the wagon after the runaway showed that one of the cleats on the front end of the wagon was broken and the front end gate ready to fall out, one wheel was twisted, one of the hounds of the wagon was broken, and some parts of the harness on the horses were broken.

It is conceded in the record that the wagon in which the deceased was riding was a "private horsedrawn vehicle." The burden of proof is, of course, upon the plaintiff to establish a prima-facie case which comes within the protection of the terms of this policy. Zohner v. Sierra Nevada Life & Casualty Co., 299 Pac. (California) 749.

At this point it is necessary to turn to the provisions of the policy. So far as material they read:

"Insures * * * against death or disability resulting directly and independently of all other causes from bodily injury sustained through external, violent and accidental means, subject to the limitations and conditions herein contained. * * * Provided such loss shall result * * * from accidental bodily injuries, solely and independently of all other causes, and only if such injuries are sustained as follows: * * * or by the wrecking or disablement of any private horsedrawn vehicle * * * in which the insured is riding or driving, or (2) by being accidentally thrown from such wrecked or disabled vehicle."

The appellant in its statement of the question for decision in this case, as heretofore set out, confines itself to the second of the above provisions of the contract: to wit, that the death occurred because the decedent was "accidentally thrown from such wrecked or disabled vehicle."

At the close of the case, the defendant made a motion to direct a verdict, which was overruled, and the case went to the jury on the instructions. The jury returned a verdict in favor of the plaintiff. The substance of the defendant's complaint is, in effect, the failure of the court to sustain this motion to direct.

The appellee's contention is that, at the time the wheel hit the chuck hole and the end gate and standard gave way at the right end, putting the gravel on the road and throwing the seat on which Slaughter was riding to the right-hand side of the road, where the accident occurred, precipitating Slaughter to the doubletrees, from which he afterwards fell and was run over,

and when the team stopped after the runaway, a cleat holding the end gate was broken and hung by one nail, and the end gate was almost ready to fall.

It is apparent under the terms of the policy that at the time Slaughter was thrown therefrom the vehicle must have been a "wrecked or disabled" one, and as the plaintiff had the burden of so establishing, she asserts, as above indicated, that the cleat which allowed the end gate to be released was broken, and the vehicle was thus a disabled one at the time Slaughter was thrown therefrom.

It is apparent from a cursory reading of the evidence that the dropping of the wheel into the chuck hole was the cause of Slaughter's being thrown onto the doubletrees, and it is equally apparent that the loosening or breaking of the cleat which held the end gate in place could have had nothing whatever to do with throwing Slaughter onto the doubletrees and thence to the ground.

We will not stop at this point to define or discuss what constitutes a "wrecked or disabled" vehicle. To one interested in this question, light will be found in the following cases: Mochel v. Iowa State Traveling Men's Assn., 203 Iowa 623; Aurnhammer v. Brotherhood Accident Co., 146 N. E. (Mass.) 47; Metropolitan Life Ins. Co. of New York v. Mennonite Mutual Fire Ins. Co., 293 Pac. (Kansas) 402, 404; Zohner v. Sierra Nevada Life & Casualty Co., 299 Pac. (Cal.) 749; Wilson v. Travelers' Insurance Co., 190 Pac. (Cal.) 366; Continental Life Ins. Co. v. Malott, 166 N. E. (Ind.) 15; Maryland Casualty Co. v. Edgar, 203 Fed. 656; Fidelity & Casualty Co. of New York v. Teter, 36 N. E. (Ind.) 283; Wright v. Continental Life Ins. Co., 264 Pac. (Wash.) 410; Lavender v. Continental Life Ins. Co., 253 Pac. (Wash.) 595; Inter-Southern Life Ins. Co. v. Bowyer, 169 N. E. (Ind.) 65; Guaranty Trust Co. v. Continental Life Insurance Co., 294 Pac. (Wash.) 585.

Assuming, without deciding, that the plaintiff is right in her contention that the vehicle was disabled, yet this in itself is not enough to make a case for the plaintiff. There must be some causal relation between the disabled vehicle and the "accidental throwing" of the plaintiff therefrom. That this is the law, see Jones v. U. S. Mutual Accident Assn., 92 Iowa 652, l. c. 665; Kirkpatrick v. Aetna Life Ins. Co., 141 Iowa 74, l. c. 80; Red-

dington v. North American Accident Ins. Co., 293 Pac. 204, 1. c. 206; Wright v. Continental Life Ins. Co., 264 Pac. (Wash.) 410; Lavender v. Continental Life Insurance, 253 Pac. (Wash.) 595; Continental Life Insurance Co. v. Malott, 166 N. E. (Ind.) 15.

In other words, as applied to the facts of this case (giving to the plaintiff the benefit of her contention that this cleat which held the end gate was broken), it of necessity follows, under the evidence, that the earliest time at which it could have been broken was when the wheel dropped into the chuck hole; but the inevitable conclusion from the evidence is that the plaintiff's decedent was thrown from the wagon by the dropping of the wheel into the chuck hole, and the breaking of this cleat could in no way have had anything to do with his being thrown from the wagon onto the doubletrees. To use the legal phrase, "there was no causal relation" whatever between the breaking of this cleat and the precipitation of the decedent from the wagon onto the doubletrees.

The plaintiff, under her burden of proof, failed to establish any causal relation whatever between the breaking of this cleat and the accidental throwing of her decedent from the wagon, and having failed so to do, she failed to make out a case. The motion to direct a verdict in favor of the defendant should have been sustained.—Reversed.

All Justices concur except Evans, Faville, and De Graff, JJ., who dissent.